UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MARTIN A. JONES,

                    Petitioner,

        v.

JEFFREY UTTECHT,

                    Respondent.

CASE NO. 3:22-CV-5371-TL-DWC

REPORT AND RECOMMENDATION

Noting Date: November 25, 2022

The District Court has referred this action to United States Magistrate Judge David W. Christel. Petitioner Martin A. Jones, represented by retained counsel Jeffrey Erwin Ellis and Todd Maybrown, filed his federal habeas petition, pursuant to 28 U.S.C. § 2254, seeking relief from his state court conviction and sentence. *See* Dkt. 1, 7. The Court concludes the state court's adjudication of Grounds 1-3 raised in the Amended Petition was not contrary to, nor an unreasonable application of, clearly established federal law. Additionally, Ground 4 is not cognizable under § 2254. Therefore, the undersigned recommends the Amended Petition be denied and a certificate of appealability not be issued.

**I.      Background**

    A.  Factual Background

        On February 23, 2011, in the Superior Court of Washington for Pierce County ("trial court"), a jury found Petitioner guilty of attempted murder in the first degree. *See* Dkt. 12-1 at 2.

Petitioner was sentenced to 600 months confinement on March 9, 2011. *See id*. at 2-10. The

Court of Appeals of the State of Washington ("state court of appeals") summarized the facts of

Petitioner's case as follows:

**I. Factual Background**

Early in the morning on February 13, 2010 in Long Beach, Washington State Patrol
Trooper Jesse Greene pulled over a minivan driven by Susan Jones,[ ] Jones's wife,
for driving in excess of the speed limit. Trooper Greene believed Susan Jones was
intoxicated and began conducting field sobriety tests. During this time, Trooper
Scott Johnson arrived as backup. Trooper Greene arrested Susan Jones for driving
under the influence.

Trooper Johnson asked Susan Jones if there was someone available who would pick
up the minivan, to which she replied "Marty" and provided a phone number.
Trooper Johnson wrote "Marty" and the phone number on his hand. Trooper Greene
then took Susan Jones to the Long Beach Police Department for processing. Shortly
after being placed into custody, Susan Jones sent text messages to Jones informing
him of her arrest.

Before leaving the scene, Trooper Greene requested a towing company to tow the
minivan. Trooper Johnson began processing the minivan's contents until George
Hill, owner of Hill Auto Body & Towing, arrived in short order.

As the minivan was being prepared for towing, Trooper Johnson noticed a white
male approaching. This white male was visibly agitated and spoke to Hill, asking
him what he was doing. Hill indicated that he was preparing the vehicle for towing.
As the unidentified white male began walking away, Trooper Johnson contacted
him and asked if he needed help with anything. The white male responded that he
did not need help and continued walking away.

Trooper Johnson went back to processing the minivan's contents. Sometime later,
Hill saw a white male approach Trooper Johnson from behind and grab him. Hill
heard a gunshot and smelled gunpowder. The white male had shot Trooper Johnson
in the back of the head. Trooper Johnson, still conscious, made eye contact with the
man who had shot him and returned fire. Hill also gave chase, but the man fired
upon him; then, Hill returned to assist Trooper Johnson. Trooper Johnson watched
the shooter flee.

Hill contacted the Washington State Patrol dispatcher, who notified law
enforcement personnel. Long Beach police arrived and one of the officers took
Trooper Johnson to Ocean Beach Hospital in Ilwaco. The physician who initiated
treatment arranged for Trooper Johnson's transfer to Oregon Health Sciences
University Hospital (OHSU) to ensure that Trooper Johnson had access to a trauma
surgeon.

1

2      At the scene, investigating officers found one .22 caliber short cartridge casing
       where Trooper Johnson had been shot. The cartridge was stamped with the logo for
3      Cascade Cartridge, Inc., an ammunition manufacturer.

4      Officers at the scene employed two K–9 units to track the scent from the shooting
       scene. One of these units led to the block on which Martin and Susan Jones resided.
       Police realized that the dog was approaching Susan Jones's home.

5

6      Police surrounded the Joneses' home. Jones exited the home and walked toward the
       beach. Police followed him and detained him at gunpoint. Jones told police that he
7      was going for a morning walk on the beach and that he had been asleep all night.
       Police questioned Jones but released him during further investigation.

8      Meanwhile, Trooper Johnson recuperated at OHSU for about three days following
       the shooting. During this time he was shown several photographs of potential
9      suspects in photomontages, as well as individual photographs. Trooper Johnson did
       not identify the shooter in any of these photos. Trooper Johnson began asking to
10     see a photo of Susan Jones's husband, which officers eventually showed him.
       Trooper Johnson identified Jones as the shooter.

11

12     Following Trooper Johnson's identification, officers arrested Jones, who continued
       to claim he was at home asleep at the time of the shooting. Police obtained warrants
13     to search his home and phone records. The phone records disclosed several phone
       calls exchanged between Jones and his neighbor in the early morning hours of
14     February 13, 2010. A search of Jones's home disclosed a box of .22 caliber Cascade
       Cartridge, Inc. ammunition manufactured in 1999, which matched the .22 shell
       casing found at the scene of Trooper Johnson's shooting.

15

16     **II. Pretrial Proceedings**
       The State charged Jones with attempted first degree murder. Jones was initially
17     arraigned in Pacific County, but due to pretrial publicity, Jones requested a venue
       change. The court granted Jones's motion and transferred the case to Thurston
18     County Superior Court. Jones filed an affidavit of prejudice against Thurston
       County Superior Court Judge Pomeroy. Unable to accommodate the trial in
19     Thurston County following the affidavit, the case was transferred back to Pacific
       County. Pacific County Superior Court then transferred venue to Pierce County.
20     The parties exchanged several pretrial evidentiary motions. Jones planned to
       present evidence that Trooper Greene had observed a different white male walking
21     past the minivan 40 minutes before the shooting, just after stopping Susan Jones.
       The State successfully moved to exclude this evidence as impermissible "other
22     suspect" evidence.

23     Jones also moved to suppress Trooper Johnson's eyewitness identification or
       alternatively present expert testimony regarding the questionable reliability of

24

eyewitness identifications. The court denied Jones's motion to suppress but allowed his expert to testify.

**III. Trial**

During trial, Jones sought to impeach the testimony of Sara Trejo, the Washington State Patrol Crime Lab's fingerprint analyst, with the e-mail of Chris Sewell, who had called the State's investigation "haphazard" and otherwise had criticized communication breakdowns among law enforcement agencies. The trial court denied the use of the e-mail for impeachment, concluding that the e-mail was a collateral matter. Jones later sought to present the testimony of Chris Sewell in his case-in-chief, but the court excluded this testimony as unduly prejudicial under ER 403.

At the conclusion of the evidence, the court indicated that the court clerk would randomly draw the names of four jurors from a rotating cylinder to determine which jurors would be alternates. During the defense's closing arguments, there was a court recess during which the court clerk randomly pulled four jurors' names. The court announced the names of the four alternate jurors following closing arguments and excused these jurors. Jones did not object to any aspect of the alternate juror drawing.

The jury found Jones guilty of attempted first degree murder and returned a verdict that included a firearm sentencing enhancement. Following the verdict, Jones moved for a new trial, claiming that the random drawing of alternate jurors violated his right to a public trial and right to be present and appear and defend. He also asserted that he should have been able to present evidence that another suspect shot Trooper Johnson. The trial court denied Jones's motions. Jones appealed.

*State v. Jones*, 175 Wash. App. 87, 91–95 (2013), *aff'd in part, rev'd in part*, 185 Wash. 2d 412 (2016); *see also* Dkt. 12-1 at 194-227 (footnote omitted).

B. Procedural Background

1. *Direct Appeal*

Petitioner challenged his conviction and sentence on direct appeal. *See* Dkt. 12-1 at 33-98. The state court of appeals vacated Petitioner's conviction and remanded for a new trial, concluding the process for selecting alternate jurors violated the right to a public trial. *Id*. at pp. 194-227. Both the State and Petitioner sought discretionary review by the Washington State Supreme Court ("state supreme court"). *See id*. at 301-65, 367-88. The state supreme court

1  granted review and, on April 21, 2016, the state supreme court found Petitioner's public trial

2  right was not implicated by the process for selecting alternate jurors and reinstated Petitioner's

3  conviction. *Id*. at 471-77. The state supreme court issued its mandate on May 19, 2016. *Id*. at

4  779-80.

5            2.   *Personal Restraint Petition*

6            On April 20, 2017, Petitioner filed a personal restraint petition ("PRP") seeking state

7  post-conviction relief. *See* Dkt. 12-2. The state court of appeals transferred the PRP to the trial

8  court for an evidentiary hearing to determine the merits of the claim. Dkt. 12-6 at 151-67. After

9  transferring the case, the state court of appeals issued the certificate of finality on November 19,

10  2019. *Id*. at 169.

11           The trial court held an evidentiary hearing and, on January 23, 2020, dismissed the PRP.

12  *Id*. at 172-826, 829-45, 847. Petitioner appealed the decision to the state court of appeals. *Id*. at

13  849-909. The state court of appeals affirmed the dismissal on July 27, 2021. Dkt. 12-1 at 14-31.

14  Petitioner filed a petition for review, which the state supreme court denied without comment on

15  March 30, 2022. Dkt. 12-6 at 995-1027, 1087. The state court of appeals issued the certificate of

16  finality on June 2, 2022. *Id*. at 1089.

17           3.   *Federal Petition*

18           On May 23, 2022, Petitioner initiated this case. Dkt. 1. In his Amended Petition (Dkt. 7),

19  Petitioner raised the following four grounds for relief:

20       1.  Petitioner was denied his Fourteenth Amendment right to due process when the State
             relied upon highly suggestive and exceedingly unreliable identification procedures that
21           created a substantial likelihood of irreparable misidentification of Petitioner.
         2.  Petitioner was denied his Sixth Amendment right to present a defense by excluding
22           critical evidence during the trial proceedings.
         3.  Petitioner was denied his Sixth Amendment right to confrontation during the trial
23           proceedings.

24

4.  Petitioner was denied his Sixth Amendment right to present a defense by excluding critical evidence during the personal restraint petition proceedings.

Dkt. 7 at 4-7. On August 24, 2022, Respondent filed, and electronically served on Petitioner's retained counsel, an Answer to the Amended Petition and relevant state court records. Dkt. 11, 12. In the Answer, Respondent asserts the state court's adjudication of the grounds raised in the Amended Petition was not contrary to, nor an unreasonable application of, clearly established federal law. Dkt. 11. Petitioner did not file a traverse.

## II.    Discussion

Respondent maintains the state courts' adjudication of the grounds raised in the Amended Petition was not contrary to, nor an unreasonable application of, clearly established federal law. Dkt. 11.

A.  Standard of Review

Pursuant to 28 U.S.C. § 2254(d)(1), a federal court may not grant habeas relief on the basis of a claim adjudicated on the merits in state court unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." In interpreting this portion of the federal habeas rules, the Supreme Court has ruled a state decision is "contrary to" clearly established Supreme Court precedent if the state court either (1) arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) confronts facts "materially indistinguishable" from relevant Supreme Court precedent and arrives at an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Moreover, under § 2254(d)(1), "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must

also be unreasonable." *Id*. at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). An unreasonable application of Supreme Court precedent occurs "if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. In addition, a state court decision involves an unreasonable application of Supreme Court precedent "'if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Williams*, 529 U.S. at 407).

The Anti-Terrorism Effective Death Penalty Act ("AEDPA") requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Further, review of state court decisions under §2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

B. Witness Identification (Ground 1)

In Ground 1, Petitioner contends his Fourteenth Amendment right to due process was denied when the State relied upon highly suggestive and exceedingly unreliable identification procedures that created a substantial likelihood of irreparable misidentification of Petitioner. Dkt. 7 at 4-5.

Generally, the reliability of relevant testimony typically falls within the province of the jury to determine. *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). That said, the Supreme Court has recognized due process safeguards where the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime. *Id*.

1    However, even if an identification is infected by improper police influence, this evidence is not

2    automatically excluded. *Id.*; *see also Manson v. Brathwaite,* 432 U.S. 98, 113–14 (1977); *Neil v.*

3    *Biggers,* 409 U.S. 188, 198–99 (1972). Rather, the trial judge must screen the evidence prior to

4    trial for reliability. *Perry*, 565 U.S. at 232. When evaluating the reliability of both in-court and

5    out-of-court identifications, the Court should consider the following factors: (1) the opportunity

6    of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention;

7    (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty

8    demonstrated by the witness at the confrontation; and (5) the length of time between the crime

9    and the confrontation. *Neil*, 409 U.S. at 199–200; *United States v. Field*, 625 F.2d 862, 866–67

10   (9th Cir. 1980). If there is "a very substantial likelihood of irreparable misidentification," the

11   evidence should not be admitted at trial. *Perry*, 565 U.S. at 232 (quotation omitted). "But if the

12   indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged

13   suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury

14   will ultimately determine its worth." *Id.*

15        Photographic procedures which emphasize the focus upon a single individual increase the

16   danger of misidentification. *Simmons v. United States*, 390 U.S. 377, 382–83 (1968); *United*

17   *States v. Hanigan*, 681 F.2d 1127, 1133 (9th Cir. 1982), *cert. denied*, 459 U.S. 1203 (1983).

18   Thus, "[c]onvictions based on in-court identifications following a pre-trial identification by

19   photograph will be set aside where the photographic identification procedure was so

20   impermissibly suggestive as to give use to a substantial likelihood of misidentification." *United*

21   *States v. Barrett*, 703 F.2d 1076, 1084 (9th Cir. 1983). Short of the point where "under all the

22   circumstances" of a given case, there is "a very substantial likelihood of irreparable

23

24

1    misidentification," those circumstances are "for the jury to weigh." *Manson*, 432 U.S. at 116

2    (quoting *Simmons*, 390 U.S. at 384).

3          Petitioner raised this ground on direct appeal. In determining Petitioner's due process

4    rights were not violated when the trial court allowed the prosecution to present eyewitness

5    identification evidence, the state court of appeals stated:

6        Jones contends that the admission of Trooper Johnson's photo identification of
    Jones violates his due process rights. First, Jones asserts that the photo

7        identification procedure was impermissibly suggestive. We agree and hold that the
    photo identification procedure employed by law enforcement officers was unduly

8        suggestive. Second, Jones asserts that the procedure was unreliable because it was
    substantially likely to result in an irreparable misidentification under the totality of

9        the circumstances. On this point, we disagree with Jones and hold that Trooper
    Johnson's photo identification of Jones was reliable enough to be considered by the

10        jury.

11        "Admission of a photo identification or a photomontage is, reduced to its essence,
    the admission of evidence in a criminal case" and is therefore "subject to the sound

12        discretion of the trial court." *State v. Kinard,* 109 Wash.App. 428, 432, 36 P.3d 573
    (2001). Instead of making independent evaluations where constitutional issues are

13        at play, appellate courts determine whether substantial evidence supports trial
    court's findings. *State v. Hill,* 123 Wash.2d 641, 647, 870 P.2d 313 (1994). We thus

14        review the trial court's order denying the suppression of Trooper Johnson's
    eyewitness identification for abuse of discretion and substantial evidence. [Fn. The

15        trial court denied the suppression of Trooper Johnson's eyewitness identification
    based on stipulated evidence presented by the parties. *See* App. A to Br. of

16        Appellant].

17        A.  The Photo Identification Procedure Was Unduly Suggestive

18        Jones bears the burden of showing that the photographic identification procedures
    employed by law enforcement were impermissibly suggestive. *State v. Vickers,* 148

19        Wash.2d 91, 118, 59 P.3d 58 (2002). A photographic identification meets the
    strictures of due process if it is not "so impermissibly suggestive as to give rise to

20        a very substantial likelihood of irreparable misidentification." *Simmons v. United
    States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). The *Simmons*

21        court provided several factors that may result in a high likelihood of
    misidentification, including where the witness has only a brief chance to observe

22        the criminal, sees him under poor conditions, sees "only the picture of a single
    individual who generally resembles the person he saw," or sees only "the pictures

23        of several persons among which the photograph of a single such individual recurs
    or is in some way emphasized." *Simmons,* 390 U.S. at 383, 88 S.Ct. 967.

24

1

2    Under these statements of the law, we conclude that the procedures employed here
     were impermissibly suggestive. The parties stipulated that following the shooting,
3    Trooper Johnson made the following statements regarding how well he saw the
     man who shot him: "I got a good look at him"; "diligent attention"; "did not get a
4    good look at the shooter"; "mostly saw a side profile." These stipulated statements
     are at best inconsistent. On February 13, 2010, while Trooper Johnson was
5    recuperating at OHSU, Portland police showed him a single photograph of a white
     male. Trooper Johnson indicated that he could not be "100% sure" that this was the
6    shooter, but indicated that the photograph resembled the shooter. Police later
     showed Trooper Johnson a sketch based on another witness's description and
7    Trooper Johnson indicated that the sketch did not look like the shooter. About an
     hour later, police showed Trooper Johnson a black-and-white, poor quality copy of
8    Jones's Department of Licensing photo; Trooper Johnson requested a clearer copy.
     He was shown another photograph of a different man 45 minutes later. Three hours
9    after that, police showed Trooper Johnson a montage with six photos, none of which
     was of Jones, and he responded that none of the men in the photos was the shooter.
10   The next day, police showed Trooper Johnson six different photos throughout the
     day, none of which was of Jones; Trooper Johnson did not identify any as the
11   shooter.

12   In the two-day period during which he was presented with these photographs,
     Trooper Johnson had the name "Marty" and a phone number written in his hand
13   from when he stopped Susan Jones's minivan. Trooper Johnson twice asked to see
     a photograph of Susan Jones's husband. On the afternoon of February 14, 2010,
14   Trooper Johnson was shown a clear, color photo of Jones's Department of
     Licensing photograph which Trooper Johnson identified as the shooter. [Fn. Based
15   on the photocopy of the Department of Licensing photograph attached to the
     parties' stipulation, it appears the Jones' name and identifying information was
16   printed below the photograph.] Later that day, after Trooper Johnson had identified
     a photograph of Jones as the shooter, a sketch artist met with Trooper Johnson to
17   complete a composite sketch of the shooter. Sometime later on the same day,
     detectives who were unaware of Trooper Johnson's previous identification of Jones
18   presented another photo montage to Trooper Johnson that included Jones's photo.
     Trooper Johnson indicated that Jones's photo "look[ed] very much similar to the
19   gentleman [he] saw."
     Throughout the time that police officers showed Trooper Johnson photographs to
20   determine who the shooter was, he repeatedly requested photos of Susan Jones's
     husband, suspecting that Jones was involved in the shooting. He was shown several
21   single photographs, including several pictures of Jones. The picture he identified as
     Jones likely had Jones's name printed on it. Then he identified Jones from a photo
22   montage after having already identified him from a single photograph. The
     identifications were made after Trooper Johnson made inconsistent statements
23   about his ability to identify Jones. This all leads us to conclude that the photo
     identifications employed by law enforcement in this case were impermissibly
24   suggestive.

REPORT AND RECOMMENDATION - 10

1

2

    B. Despite Suggestiveness, the Photo Identification Procedure Was Reliable Enough to Be Given to the Jury

3

4

5

6

Even though several aspects of the photo identification procedures were suggestive, the reliability of the identification, considering the totality of the circumstances, controls the determination of whether the procedures created a substantial likelihood of irreparable misidentification. *Manson v. Brathwaite,* 432 U.S. 98, 113–14, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In other words, if the identification is reliable, it cures the suggestive nature of the confrontation procedure.

7

8

9

10

11

12

The United States Supreme Court has provided several factors to determine the identification's reliability, "includ[ing] the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Brathwaite,* 432 U.S. at 114; *Biggers,* 409 U.S. at 199–200. Based on the facts presented in the parties' stipulation, the trial court carefully weighed each of these factors in its order denying Jones's motion to suppress Trooper Johnson's identification. It determined that the there was no substantial likelihood of irreparable misidentification. We hold that the trial court did not abuse its discretion by reaching this determination.

13

14

Furthermore, in *Brathwaite,* the United States Supreme Court indicated that the reliability of eyewitness identification was best left to the jury:

15

16

17

    [S]uch evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

18

19

20

432 U.S. at 116. The trial court permitted evidence of Trooper Johnson's eyewitness identification, noting that any defects in the evidence go to the evidence's weight, not its admissibility. It did not abuse its discretion in doing so. We hold that the trial court appropriately allowed the prosecution to present eyewitness identification evidence, leaving for the jury the question of how much credence such evidence deserved.[ ]

21

22

23

24

1   *State v. Jones*, 175 Wash. App. 87, 108 (2013) (some footnotes omitted); *see also* Dkt. 12-1 at

2   211-15.[1]

3            During a pretrial hearing, Petitioner's counsel argued Trooper Johnson's pretrial

4   identification of Petitioner should be suppressed. As detailed by the state court of appeals, the

5   facts showed Trooper Johnson was shot at approximately 12:42 A.M. Dkt. 12-7 at 414.

6   Immediately after the shooting, Trooper Johnson provided some general identification

7   information regarding the suspect's size, race, and height. *Id*. While at OHSU, Trooper Johnson

8   was provided with many photographs of possible suspects. *Id*. at 415. Because Mrs. Jones had

9   requested Petitioner pick up her vehicle after the DUI stop, Trooper Johnson knew Petitioner's

10  name. *Id*. at 415-16. Trooper Johnson stated he suspected Petitioner had something to do with the

11  shooting and requested to see a photograph of Petitioner. *Id*. at 416.

12           A day after the shooting, Petitioner's Department of Licensing ("DOL") photograph was

13  emailed to an officer stationed at OHSU. *Id*. The officer showed Trooper Johnson Petitioner's

14  DOL photo, which included Petitioner's name, and Trooper Johnson looked at the photo and

15  identified Petitioner as the shooter by saying, "I hate to say it, but that's him." *Id*. at 417. About

16  four hours later, Trooper Johnson was shown a six-photograph montage – Petitioner's DOL

17  photo was included in the photo montage. *Id*. at 421. But, the officers who showed Trooper

18  Johnson the photo montage did not know Trooper Johnson had earlier viewed a photo of

19  Petitioner and identified him as the shooter. *Id*. From the photo montage, Trooper Johnson

20  selected Petitioner as the shooter. Dkt. 12-1 at 93. Trooper Johnson also assisted in creating a

21

22  _____

23           [1] The state court of appeals also addressed Petitioner's claim that the trial court should have included a
    cautionary jury instruction related to the reliability of eyewitness identification. *See Jones*, 175 Wash. App. at 108.
    As Petitioner did not raise this ground in his Petition, the Court declines to consider the state court's decision
24  regarding a cautionary jury instruction.

1  sketch, which was not finished until after Trooper Johnson had identified Petitioner from the

2  single picture identification. Dkt. 12-7 at 421.

3      Petitioner's counsel argued that, because Trooper Johnson has been asking to see a photo

4  of Petitioner for a day and a half, he had a very strong predisposition to find Petitioner was

5  involved in the shooting. *Id*. at 417. Petitioner's counsel asserted that the identification was

6  "tantamount to a police officer telling an eye witness . . . that a certain person is the suspect[.]"

7  *Id*. But, worse, the photo of Petitioner included his name when all the other photographs did not

8  contain identifying information. *Id*. Counsel also argued that the photo montage and the sketch

9  should be suppressed because Trooper Johnson had identified Petitioner from the single photo

10 identification prior to viewing the photo montage and completing the sketch. *Id*. at 421.

11     The State argued Trooper Johnson was not predisposed to identify Petitioner. Dkt. 12-7 at

12 423. Rather, the State asserted Trooper Johnson believed the person who shot him had interest in

13 Mrs. Jones' vehicle and he had Petitioner's name and phone number on his hand. *Id*. Trooper

14 Johnson wanted to see a picture of Petitioner to exclude or identify Petitioner as the shooter. *Id*.

15 The State argued that the procedure used was not so unreliable or untrustworthy that the jury

16 would be unable to weigh the evidence and make a rational decision. *Id*. at 427. The State

17 asserted there was an exigent circumstance exception in this case that allowed the police to

18 employ a suggestive identification procedure due to logistics or time restraints. *Id*. at 430. It also

19 argued there was no substantial likelihood of irreparable misidentification. *Id*. at 435.

20     In ruling on the motion to suppress, the trial court stated,

21     . . . the motion to suppress the eyewitness identification testimony is denied. I do
       not find the due process violation. The procedures that were employed do not create
22     the substantial likelihood of an irreparable misidentification.

23     Certainly, it's not preferred to show a single photo, but in light of the totality of the
       circumstances, and I will go through the <u>Manson</u> factors, I th[ink] that there are a

24

1    couple of things going on. One, I think that there was an emergency situation
2    potential for harm to citizens. Law enforcement doing the investigation in Long
     Beach, the victim in Portland, the poor communications between the areas.

3    The <u>Manson</u> factors indicate . . . the opportunity of the witness to view the criminal
     at the time of the crime, I think have been satisfied. The information that I have
4    reviewed indicates that Trooper Johnson had an opportunity and spoke to face-to-
     face as well as from the profile side of the alleged suspect. The degree of attention
5    provided by the trooper at the time of the incident and the other <u>Mason</u> factors, the
     accuracy of the witness's description prior to the viewing of the photo, the level of
6    certainty demonstrated at a confrontation, and the time between the time of the
     alleged crime and the confrontation. I didn't chart it out with your new timeline,
7    less than 24 hours 12:42 a.m. on the 13th, and I think the photo was shown at noon
     on the 14th. . . .It looks like 3:45 p.m.
8
     The Court finds that the identification was independent, reliable and the substantial
9    likelihood of irreparable misidentification is not present.

10   *Id*. at 436-37. The trial court, however, granted Petitioner's motion seeking to allow Dr. Geoffrey

11   Loftus, Petitioner's identification expert, to testify regarding eyewitness identification

12   procedures and their reliability. *Id*. at 442-43.

13          During trial, Trooper Johnson testified that, while he was at the location of the traffic stop

14   of Mrs. Jones, Petitioner approached the tow truck operator, George Hill. Dkt. 12-12 at 284-85.

15   Trooper Johnson stated Petitioner had an angry expression on his face and was traveling at a

16   brisk pace toward Mr. Hill. *Id*. at 284. Petitioner had a brief conversation with Mr. Hill, then

17   Petitioner abruptly turned around and headed back in the direction he came. *Id*. at 287. Trooper

18   Johnson asked if he could help Petitioner with anything, to which Petitioner angrily responded,

19   "No." *Id*. at 289. Trooper Johnson identified Petitioner's clothing and appearance. *Id*. at 289-90.

20   Petitioner then left the scene and Trooper Johnson continued to inventory the vehicle for

21   impounding. *Id*. at 289-98. Trooper Johnson testified that, a few minutes later, he was

22   approached from behind and shot in the back of the head. *Id*. at 298-303. Trooper Johnson saw

23   Petitioner at the scene of the shooting and shot at him. *Id*. at 303, 304-05.

24

1      Additionally, at trial, Trooper Johnson explained the identification process that was used

2  to show him potential suspects, including Petitioner, while he was in the hospital following the

3  shooting. *Id*. at 322-29. He stated he requested a photo of Petitioner because he knew Petitioner

4  and Mrs. Jones lived near the shooting location and were involved in the DUI incident. *Id*. at

5  323-24. Trooper Johnson testified he had no doubts Petitioner was the person who shot him. *Id*.

6  at 332.

7      On cross-examination, Petitioner's counsel questioned Trooper Johnson about his

8  identification of Petitioner. *Id*. at 380-99. Counsel also questioned Trooper Johnson about the

9  preferable way to show photos of suspects and Trooper Johnson's training related to photo

10 montages. *Id*. at 394-95, 402, 404-07. Petitioner was also able to elicit testimony from Dr.

11 Loftus, who testified as an expert regarding human memory and psychological impacts on

12 reliability of specific identification procedures. *See* Dkt. 12-13 at 435-83, 499-501.

13     Based on the totality of the circumstances, the identification procedures in this case were

14 not so unreliable as to create a substantial likelihood of irreparable misidentification. The record

15 shows Trooper Johnson viewed Petitioner at the scene of the shooting and that he was attentive

16 to Petitioner during the shooting. Trooper Johnson made eye-contact with Petitioner and was

17 looking at Petitioner when he shot at Petitioner. Following the shooting, Trooper Johnson

18 provided a general description of the suspect that matched Petitioner's description. The length of

19 time between the shooting and the photo identification was also relatively short – one to two

20 days. Moreover, Trooper Johnson was confident Petitioner was the individual that shot him when

21 he viewed the photographs and when identifying Petitioner in court.

22     The trial court and state court of appeals, relying on Supreme Court precedent,

23 reasonably considered the relevant factors and reached the conclusion that Trooper Johnson's

24

1    eyewitness identification was not so unreliable as to create a substantial likelihood of irreparable

2    misidentification and that this was a matter for the jury to consider regarding the evidence's

3    weight, not admissibility. Petitioner has failed to show the state court of appeals' conclusion that

4    Petitioner's due process rights were not violated when the trial court permitted evidence of

5    Trooper Johnson's eyewitness identification was contrary to, or was an unreasonable application

6    of, clearly established federal law. Accordingly, the Court recommends Ground 1 be denied.

7        C.    Present a Defense (Grounds 2 & 4)

8        In Ground 2, Petitioner alleges he was denied his Sixth Amendment right to present a

9    defense when the trial court excluded "critical evidence" during the trial proceedings. Dkt. 7 at

10   5-6. In Ground 4, Petitioner asserts he was denied his Sixth Amendment right to present a

11   defense when "critical evidence" was excluded from his PRP proceedings. *Id*. at 7.

12       The Constitution guarantees a criminal defendant a meaningful opportunity to present

13   relevant evidence in his own defense at trial. *See, e.g.*, *Taylor v. Illinois*, 484 U.S. 400, 408

14   (1988); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). "The Supreme Court has made clear that

15   the erroneous exclusion of critical, corroborative defense evidence may violate both the Fifth

16   Amendment due process right to a fair trial and the Sixth Amendment right to present a defense."

17   *DePetris v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir. 2001) (citations omitted). However, "the

18   right to present relevant testimony is not without limitation. The right 'may, in appropriate cases,

19   bow to accommodate other legitimate interests in the criminal trial process.'" *Rock v. Arkansas*,

20   483 U.S. 44, 55 (1987) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)). Relevant

21   evidence may be excluded for failure to comply with procedural requirements, and "any number

22   of familiar and unquestionably constitutional evidentiary rules also authorize the exclusion of

23   relevant evidence." *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (plurality opinion). "While the

24

Constitution ... prohibits the exclusion of defense evidence under rules that serve no legitimate

purpose or that are disproportionate to the ends that they are asserted to promote, well-

established rules of evidence permit trial judges to exclude evidence if its probative value is

outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential

to mislead the jury." *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006).

### 1.   *Ground 2*

In Ground 2, Petitioner alleges he was denied his Sixth Amendment right to present a

defense when the trial court excluded "critical evidence" during the trial proceedings. Dkt. 7 at

5-6. Specifically, Petitioner contends the trial court refused to allow Petitioner to present

information or evidence regarding a man seen by Trooper Greene prior the shooting. *Id*.

In determining Petitioner's right to present a defense was not violated, the state court of

appeals stated:

> Jones argues that the trial court violated his constitutional right to present a defense
> by excluding Trooper Greene's testimony that Greene saw an individual walk by
> when he stopped Susan Jones's car. According to Jones, Trooper Green's
> description of this individual matched the description given by George Hill, the tow
> truck operator, who was present at the time of the shooting. The court ruled that
> Trooper Greene could not testify about seeing another individual unless the
> defendant was able to show the necessary foundation connecting another suspect to
> the shooting. The trial court did not abuse its discretion in so ruling.
>
> The Sixth Amendment to the United States Constitution provides in pertinent part
> that in "all criminal prosecutions, the accused shall enjoy the right ... to have
> compulsory process for obtaining witnesses in his favor...." The United States
> Supreme Court has held that "[j]ust as an accused has the right to confront the
> prosecution's witnesses for the purpose of challenging their testimony, he has the
> right to present his own witnesses to establish a defense. This right is a fundamental
> element of due process of law." *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct.
> 1920, 18 L.Ed.2d 1019 (1967). However, this right is not absolute. *State v. Smith,*
> 101 Wash.2d 36, 41, 677 P.2d 100 (1984). A criminal defendant has no
> constitutional right to present irrelevant evidence. *Thomas,* 150 Wash.2d at 857, 83
> P.3d 970; *State v. Hudlow,* 99 Wash.2d 1, 15, 659 P.2d 514 (1983).

Under Washington law, "[w]hen there is no other evidence tending to connect another person with the crime, such as his bad character, his means or opportunity to commit the crime, or even his conviction of the crime, such other evidence is irrelevant to exculpate the accused." *Thomas,* 150 Wash.2d at 857, 83 P.3d 970. Our Supreme Court's decision in *State v. Downs,* 168 Wash. 664, 13 P.2d 1 (1932), is instructive. There, the court upheld the exclusion of evidence that a well-known burglar was in Seattle on the night of a burglary. *Downs,* 168 Wash. at 665–66, 13 P.2d 1. The mere fact that another burglar was in Seattle on the same night of the subject burglary was not a "circumstance[] tending in some manner to connect him with the commission of the crime." *Downs,* 168 Wash. at 668, 13 P.2d 1. Defendants must show more than mere opportunity to commit the crime because such evidence is " 'the most remote kind of speculation.' " *Thomas,* 150 Wash.2d at 857, 83 P.3d 970 (quoting *Downs,* 168 Wash. at 668)

Jones's proposed presentation of Trooper Greene's testimony would have shown only that when Trooper Greene stopped Susan Jones's car, Greene saw someone else on the street who may have had an opportunity to shoot Trooper Johnson. But 40 minutes elapsed between Trooper Greene's observation and the shooting. Thus, Trooper Greene's testimony would not demonstrate the required connection between the person Trooper Greene saw and the shooter, only that this other person walked by 40 minutes earlier. The trial court did not abuse its discretion by excluding Trooper Greene's observation of the unidentified pedestrian.

Jones argues that *State v. Maupin,* 128 Wash.2d 918, 913 P.2d 808 (1996), a case involving the constitutional right to call witnesses to support the defense, compels a different result. In *Maupin,* the defendant sought to elicit testimony from a witness who saw the girl that the defendant allegedly raped and murdered with another person *after* the rape and murder were supposed to have taken place under the State's theory. *Maupin,* 128 Wash.2d at 922. Our Supreme Court held that the witness's testimony went beyond speculation about mere motive or opportunity that someone else committed the crime because the witness "would have testified he saw the kidnapped girl with someone other than the defendant *after the time of kidnapping.*" Maupin, 128 Wn.2d at 928 (emphasis added). Unlike *Maupin,* in which the defendant demonstrated the necessary nexus between another suspect and the crime, here Jones's argument boils down to the mere presence of another person on a public street who may have had the opportunity to shoot Trooper Johnson. This other-suspect evidence is irrelevant to exculpate Jones. We hold that the trial court's exclusion of this evidence did not violate Jones's constitutional right to present a defense. [Fn. In his SAG (Statement of Additional Grounds), Jones asserts that the State was permitted to state that all other suspects were cleared, despite the lack of investigation of all 1600 tips called in from citizens. Even if Jones' assertion is true, Jones fails to demonstrate that any of these tips demonstrate the necessary connection between another suspect and Trooper Johnson's shooting.]

*Jones,* 175 Wash. App. at 108; *see also* Dkt. 12-1 at 218-20.

1    The state court record shows the State moved to exclude evidence related to "other

2    suspects." *See* Dkt. 12-7 at 398. The trial court heard proffers from both the State and

3    Petitioner's trial counsel regarding excluding Trooper Greene's testimony related to another

4    potential suspect. *Id*. at 398-413. The State argued Trooper Greene, who was the person who

5    arrested Petitioner's wife on the night of the shooting, stated in his report that a white male

6    walked by while he was conducting the traffic stop and arrest. *Id*. at 403. Petitioner's counsel

7    argued Trooper Greene's report indicated that he saw an individual with a watch cap walking

8    down the street on the sidewalk right next to the traffic stop. *Id*. at 404. Trooper Greene's

9    description of this individual matched the tow truck driver, George Hill's, description of the

10   shooter, including a similar cap. *Id*. Petitioner's counsel argued the individual was in the same

11   geographical location of the shooting 15 to 20 minutes before Trooper Johnson was shot. *Id*.

12   Counsel also argued Trooper Greene was sent out to several roadblocks to attempt to identify

13   this individual after the shooting. *Id*. Counsel asserted that Trooper Greene identified someone

14   very different from Trooper Johnson. *Id*. at 405. The State countered that Trooper Greene would

15   testify he did not think the person whom he saw had anything to do with the shooting, but the

16   State Patrol wanted to talk to anyone who might know something about the shooting. *Id*. at 408-

17   09.

18       The trial court considered the arguments and stated:

19       State's motion is granted. The case law does not support other suspect evidence
         without something more specific, and it has to be more of a nexus than motive,
20       ability and opportunity, and that has not been shown.

21   *Id*. at 413.

22       "Only rarely ha[s the Supreme Court] held that the right to present a complete defense

23   was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v.*

24

*Jackson*, 569 U.S. 505, 509 (2013) (per curiam). Even so, in some circumstances, state rules of

evidence cannot be used to prevent a defendant from presenting reliable evidence crucial to his

defense. *Washington v. Texas*, 388 U.S. 14, 22 (1967); *Chambers*, 410 U.S. at 302; *Rock*, 483

U.S. at 55–56.

       Here, the state court of appeals found the trial court did not abuse its discretion in

excluding Trooper Greene's testimony about seeing another individual when he was arresting

Mrs. Jones. The evidence shows Trooper Greene saw a person walk by him when he was

conducting the traffic stop on Mrs. Jones. There was no information identifying this individual or

motive connecting the individual to the shooting. The only nexus was the fact the individual

walked by the traffic stop approximately 30-40 minutes before the shooting. As Trooper

Greene's testimony would have provided limited information showing sufficient "other suspect"

evidence, Petitioner fails to show the trial court's decision to exclude Trooper Greene's

testimony about seeing another individual at the time of the traffic stop deprived Petitioner of his

right to present a defense. On this basis, the state court of appeals reasonably concluded

Petitioner did not sufficiently connect Trooper Greene's identification of an individual that

walked by the traffic stop to the shooting.

       Furthermore, the Supreme Court has not "squarely addressed" whether a trial court's

exercise of discretion to exclude evidence violates a defendant's right to present a complete

defense, nor has it clearly established a "controlling legal standard" for evaluating such

exclusions. *See Moses v. Payne*, 555 F.3d 742, 758 (9th Cir. 2009); *Brown v. Horrell*, 644 F.3d

969, 983 (9th Cir. 2011). As Petitioner has not shown there is clearly established federal law,

Petitioner has not shown the state court's decision upholding the exclusion of the "other suspect"

evidence is contrary to, or involved an unreasonable application of, clearly established Supreme

Court precedent. *See Rafay v. Obenland*, 2020 WL 5984210, at \*18 (W.D. Wash. Jan. 28, 2020),

*report and recommendation adopted*, 2020 WL 5982000 (W.D. Wash. Oct. 8, 2020) (finding

state court's decision upholding exclusion of "other suspect" evidence was not contrary to, or an

unreasonable application of, clearly established law); *Little v. Haynes*, 2021 WL 2211309, \*11

(W.D. Wash. May 12, 2021) (same). Accordingly, the Court recommends Ground 2 be denied.

       2.  *Ground 4*

     In Ground 4, Petitioner contends he was denied the right to present a defense during his

PRP proceedings. Dkt. 7 at 7. "[A] petition alleging errors in the state post-conviction review

process is not addressable through habeas corpus proceedings." *Franzen v. Brinkman*, 877 F.2d

26, 26 (9th Cir. 1989). As Ground 4 alleges errors related to Petitioner's state post-conviction

proceeding only, this claim is not cognizable under § 2254. Accordingly, the Court recommends

Ground 4 be denied.

   D.  <u>Right to Confront (Ground 3)</u>

     In Ground 3, Petitioner contends his Confrontation Clause rights were violated when he

was not allowed to present evidence that the Washington State Patrol's investigation was

"shoddy and biased," allowing the State to present a false impression that the Washington State

Patrol's investigation was flawless and trustworthy. Dkt. 7 at 6-7. The Court notes it is unclear if

Petitioner is attempting to raise a Confrontation Clause violation resulting from his inability to

cross-examine Sarah Trejo or a Sixth Amendment right to present a defense based on his

inability to present Chris Sewell's testimony. *See id*. The Amended Petition does not adequately

explain this ground and Petitioner did not file a traverse to further expand on this ground. As

Petitioner explicitly stated his right to confront was violated, the Court has focused its analysis

1    on the Confrontation Clause. However, as discussed below, the Court also considered

2    Petitioner's right to present a defense regarding the exclusion of Mr. Sewell's testimony.[2]

3      The Confrontation Clause of the Sixth Amendment provides: "In all criminal

4    prosecutions, the accused shall enjoy the right . . . to be confronted by the witnesses against

5    him." U.S. Const. Amend. VI. The Confrontation Clause applies to the states through the

6    Fourteenth Amendment, *Pointer v. Texas*, 380 U.S. 400, 403 (1965), and it guarantees criminal

7    defendants the right to confront and cross-examine the witnesses against them. *Chambers*, 410

8    U.S. at 294-95. "The main and essential purpose of confrontation is to secure for the opponent

9    the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974). This right

10   includes the right to cross-examine adverse witnesses to attack their general credibility or show

11   their possible bias or self-interest in testifying. *Olden v. Kentucky*, 488 U.S. 227, 231 (1988).

12     Despite this constitutional guarantee, trial judges retain wide latitude to impose

13   reasonable limits on cross-examination "based on concerns about, among other things,

14   harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is

15   repetitive or only marginally relevant." *Delaware v Van Arsdall*, 475 U.S. 673, 679 (1986). A

16   trial court's restrictions on the defendant's right to cross-examine witnesses may not be

17   "arbitrary or disproportionate to the purposes they are designed to serve" and may not prohibit

18   all inquiry into the possibility that a witness is biased. *Ortiz v. Yates*, 704 F.3d 1026, 1034, 1035

19   (9th Cir. 2012) (quotations omitted) (citing *Michigan v. Lucas*, 500 U.S. 145, 151 (1991)).

20   Generally, the Confrontation Clause is satisfied when the defendant has the opportunity to show

21   the weaknesses in a witness's testimony and undermine a witness's credibility. *Hayes v. Ayers*,

22

23   —————————————

24    [2] The Court notes Petitioner raised this ground as a denial of his right to present a defense in his direct appeal. *See* Dkt. 12-1 at 84-85. Respondent does not argue Ground 3 is unexhausted. *See* Dkt. 11.

1    632 F.3d 500, 518 (9th Cir. 2011) (citations omitted) ("No Confrontation Clause violation

2    occurs as long as the jury receives sufficient information to appraise the biases and motivations

3    of the witness.").

4          In determining Petitioner's Sixth Amendment rights were not violated, the state court of

5    appeals stated:

6          Jones sought to present the testimony of Chris Sewell, a Washington State Patrol
           Crime Lab supervisor, who had sent an e-mail calling the police investigation of
7          Trooper Johnson's shooting "haphazard." Jones planned to use this e-mail to
           impeach the State crime lab's fingerprint analyst. Sewell's general e-mail regarding
8          the police investigation being haphazard had nothing specifically to do with the
           fingerprint analysis of various items that was performed by the State's fingerprint
9          analyst. The e-mail was not offered for any purpose pertaining to fingerprint
           analysis. Therefore, if permitted, the e-mail would have constituted impeachment
10         on a collateral matter. *See State v. Alexander,* 52 Wash.App. 897, 901–02, 765 P.2d
           321 (1988) ("Contradictory or impeaching testimony is collateral if it could not be
11         shown in evidence for any purpose independent of contradiction."). Thus, we hold
           that the trial court's exclusion of this impeachment evidence was not an abuse of
12         discretion and did not implicate Jones's Sixth Amendment right to present a
           defense.
13
           The evidence of Sewell's opinion of the investigation was also properly excluded
14         under ER 403 because "its probative value is substantially outweighed by the
           danger of unfair prejudice, confusion of the issues, or misleading the jury...."
15         Although perhaps relevant to the general quality of the police investigation, the
           generality of Sewell's comments minimize their probative value. Allowing a crime
16         lab supervisor to openly and generally criticize the entire police investigation
           through an opinion that it was haphazard would have elicited an emotional, rather
17         than rational, response among the jurors. Furthermore, after hearing testimony from
           several Washington State Patrol troopers, as well as from forensic specialists
18         involved in the investigation, Sewell's testimony at a late trial stage could have
           misled or at best have confused the jury. Therefore, we hold that the trial court did
19         not abuse its discretion excluding Sewell's testimony. We also hold that this
           exclusion of evidence did not impinge Jones's ability to present a defense. After
20         all, Jones had ample opportunity to cross-examine the State's forensic witnesses
           and present his own forensic witnesses.
21
     *Jones*, 175 Wash. App. at 108; *see also* Dkt. 12-1 at 220-21.
22
           At trial, the State filed a motion in limine requesting the trial court exclude testimony
23
     regarding an email sent from Chris Sewell, a supervisor at the Washington State Crime Lab, to
24

1   Sarah Trejo, a fingerprint analyst from the Crime Lab. *See* Dkt. 12-12 at 6. The email from Mr.

2   Sewell was "criticizing the investigation, basically saying he thought that [it] was haphazard"

3   and the communication was lacking. *Id*. at 6-8. After the State produced the email to Petitioner,

4   Petitioner's counsel notified the State they wanted to call Mr. Sewell as a witness to testify that

5   he did not think the State Patrol investigation was well-organized. *Id*. at 7. Petitioner's counsel

6   also sought to cross-examine Ms. Trejo regarding the contents of the email, arguing it was

7   relevant regarding whether she thought the investigation was haphazard and whether Mr. Sewell

8   had directed her to not document investigation concerns in the case file. *Id*. at 8-9. The State

9   objected to the testimony because it was irrelevant. *Id*. at 6-7, 9-10. The trial court prohibited

10  Petitioner from using Mr. Sewell's email during cross-examination of Ms. Trejo because the

11  evidence was collateral. *Id*.

12          Later, Petitioner subpoenaed Mr. Sewell and the State sought to re-address the issue of

13  whether Mr. Sewell could testify. *See* Dkt. 12-12 at 508. In moving to exclude Mr. Sewell's

14  testimony, the State argued Mr. Sewell was only providing his opinion as to how the

15  investigation was run and did not point to any specific piece of evidence before the jury. *Id*. at

16  509. The State also argued the evidence was cumulative. *Id*. at 510. Petitioner's counsel argued

17  the evidence showed Mr. Sewell's opinions about the integrity of the investigation and directed

18  "underlings" to not document concerns in the case file. *Id*. at 512.

19          After hearing argument, the trial court ruled as follows:

20          The motion [to exclude Mr. Sewell] is granted.

21          I have considered, and I think it is appropriate to make a 403 probative. I have
            looked at 402 again. It has limited probative value. I think there are too many

22          interpretations possible from this Exhibit 402. The defense can still argue based
            upon the evidence that's been introduced to date.

23
    *Id*. at 519.
24

REPORT AND RECOMMENDATION - 24

1    Initially, the Court notes that Petitioner's Confrontation Clause claim is premised on state

2    evidentiary rulings made by the trial court. *See* Dkt. 7. To the extent Petitioner is challenging a

3    state evidentiary ruling, that claim is not cognizable in a federal habeas action *See Jammal v. Van*

4    *de Kamp*, 918, 919–20 (9th Cir. 1991) (federal-court habeas petitioner may not challenge

5    evidentiary rulings as being incorrect under *state* law).

6    Furthermore, "courts will not find a constitutional violation based on the exclusion of

7    evidence proffered by the defense if the excluded evidence was, among other things, only

8    marginally relevant or repetitive, incompetent, privileged, poses an undue risk of harassment,

9    prejudice, or confusion of the issues, or is otherwise inadmissible." *Hansen v. Long*, 2014 WL

10    3435871, at *10 (C.D. Cal. Jan. 28, 2014) (citing *Montana*, 518 U.S. at 42; *Crane*, 476 U.S. at

11    689–90; *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). Here, the record shows the state

12    court of appeals found the evidence in question – an email – did not pertain to any specific

13    evidence and would have constituted impeachment evidence on a collateral matter. *See United*

14    *States v. Higa*, 55 F.3d 448, 452 (9th Cir. 1995) ("A collateral contradiction is typically one on a

15    point not related to the matters at issue, but designed to show that the witness' false statement

16    about one thing implies a probability of false statements about the matters at issue."). Petitioner

17    failed to show how the email was relevant to Ms. Trejo's fingerprint analysis in this case. The

18    email did not contain information regarding Ms. Trejo's opinion of the investigation, nor did it

19    contain information regarding the fingerprint analysis during this investigation. Because the

20    evidence was not directly related to any issue before the jury, the state court of appeals decision

21    that the trial court did not err in determining the evidence was collateral and excluding it when

22    cross-examining Ms. Trejo was not unreasonable. *See Jackson*, 569 U.S. at 512 (emphasis in

23

24

1    original) ("[T]his court has never held that the confrontation clause entitles a criminal defendant

2    to introduce *extrinsic evidence* for impeachment purposes.").

3        Petitioner also fails to identify any clearly established federal law indicating his

4    confrontation rights or right to present a defense was violated by the state court's application of

5    Washington State Evidence Rule 403 when excluding Mr. Sewell's testimony. *See* Dkt. 7.

6    Rather, it does not appear the Supreme Court has decided this issue. The Ninth Circuit has stated:

7        We have previously held that a trial court's exercise of discretion to exclude
        evidence under a rule of evidence that requires balancing probative value against
8        prejudice could not be an unreasonable application of clearly established Supreme
        Court precedent, because the Court has never addressed the question whether such
9        a rule could violate a defendant's constitutional rights. *See Moses*, 555 F.3d at 758–
        59. No Supreme Court decision has established such a rule since we reached this
10       conclusion in *Moses*.

11   *Robertson v. Pichon*, 849 F.3d 1173, 1189 (9th Cir. 2017); *see Hale v. Cate*, 530 Fed.Appx. 636

12   (9th Cir. 2013) (The Ninth Circuit has held that under AEDPA, "even clearly erroneous"

13   evidentiary errors "that render a trial fundamentally unfair may not permit the grant of federal

14   habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the

15   Supreme Court." (quoting *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) and 28

16   U.S.C. § 2254(d))).

17       Because the Supreme Court has not squarely addressed whether the right to present a

18   defense may be violated by the state court's application of a state evidentiary rule of this nature,

19   the state court of appeal's rejection of Petitioner's claim cannot be contrary to, or an

20   unreasonably application of, clearly established federal law. *See Smith v. Small*, 697 Fed. App'x

21   538, 539 (9th Cir. 2017) (state appellate court ruling affirming trial court's exclusion of proposed

22   defense witnesses was not contrary to clearly established federal law because the Supreme Court

23   has not squarely addressed the constitutionality of the discretionary exclusion of evidence).

24

1      Moreover, Petitioner has not shown it was unreasonable for the state court to exclude Mr.

2  Sewell's testimony because his opinion regarding the investigation was unfairly prejudicial or

3  would confuse the jury. The information was a general critique of the investigation. In the email,

4  Mr. Sewell generally noted his opinion was that the State Patrol's investigation was haphazard

5  and, at times, lacking in communication. There is no indication regarding what portions of the

6  investigation he believed were completed in a haphazard way or why he formed such an opinion.

7  He also does not indicate if the lack of communication was from the State Patrol or within the

8  Crime Lab. The statement was open to a variety of possible interpretations. Additionally, the

9  general nature of the statement, without any specific reference to evidence in this case, had the

10  potential to elicit an emotional response from the jurors. The statement, therefore, had limited

11  probative value and Petitioner has not shown the state court's finding that Mr. Sewell's

12  testimony would be unfairly prejudicial was not unreasonable.

13      Importantly, Petitioner's counsel was able to cross-examine the State's forensic

14  witnesses, who worked in the crime lab, and present his own witnesses regarding the

15  investigation. *See e.g.* Dkt. 12-11 at 230-62, 265-26, 454-92; Dkt. 12-12 at 20-23; Dkt. 12-13 at

16  6-23, 30-32, 367-434. Petitioner does not assert he was unable to elicit testimony from these

17  witnesses that was similar to Mr. Sewell's potential testimony regarding the investigation. As

18  such, Petitioner fails to show he was unable to confront the State's witnesses and present

19  evidence regarding the State Patrol's investigation.

20      For these reasons, Petitioner fails to show the state court of appeals' conclusion that

21  Petitioner's Sixth Amendment rights were not violated when the trial court excluded evidence

22  that Mr. Sewell thought the State Patrol's investigation was haphazard was contrary to, or was an

23

24

1  unreasonable application of, clearly established federal law. Accordingly, the Court recommends

2  Ground 3 be denied.

3  **III.    Evidentiary Hearing**

4         The decision to hold an evidentiary hearing is committed to the Court's discretion.

5  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a

6  hearing could enable an applicant to prove the petition's factual allegations, which, if true, would

7  entitle the applicant to federal habeas relief." *Id.* at 474. In determining whether relief is

8  available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the

9  state court. *Cullen*, 563 U.S. at 181-82. A hearing is not required if the allegations would not

10  entitle Petitioner to relief under §2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the

11  record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district

12  court is not required to hold an evidentiary hearing." *Id*. The Court does not find it necessary to

13  hold an evidentiary hearing because, as discussed in this Report and Recommendation,

14  Petitioner's grounds for relief may be resolved on the existing state court record.

15  **IV.    Certificate of Appealability**

16         A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district

17  court's dismissal of the federal habeas petition only after obtaining a certificate of appealability

18  from a district or circuit judge. *See* 28 U.S.C. § 2253(c). "A certificate of appealability may issue

19  . . . only if the [petitioner] has made a substantial showing of the denial of a constitutional right."

20  28 U.S.C. § 2253(c)(2). Petitioner satisfies this standard "by demonstrating that jurists of reason

21  could disagree with the district court's resolution of his constitutional claims or that jurists could

22

23

24

1    conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-*

2    *El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

3        No jurist of reason could disagree with this Court's evaluation of Petitioner's claims or

4    would conclude the issues presented in the Amended Petition should proceed further. Therefore,

5    the Court concludes Petitioner is not entitled to a certificate of appealability with respect to the

6    Amended Petition.

7    **V.     Conclusion**

8        For the above stated reasons, the Court concludes Petitioner has not shown the state

9    courts' adjudication of Grounds 1-3 was contrary to, nor an unreasonable application of, clearly

10    established federal law. The Court also finds Ground 4 is not cognizable under § 2254. The

11    Court finds an evidentiary hearing is not necessary. Therefore, the Court recommends the

12    Amended Petition be denied and a certificate of appealability not be issued.

13        Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

14    fourteen (14) days from service of this report to file written objections. *See also* Fed. R. Civ. P.

15    6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

16    review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those

17    objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v.*

18    *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

19    imposed by Fed. R. Civ. P. 72(b), the Clerk is directed to set the matter for consideration on

20    November 25, 2022, as noted in the caption.

21        Dated this 9th day of November, 2022.

22

23                          _____

24                          David W. Christel
                             United States Magistrate Judge